**Emma Jean Childers MACIEJACK and Roy Tolson, Defendants-Appellants,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

**No. 3–176A14.**

Court of Appeals of Indiana,
Third District.

Sept. 6, 1979.

Rehearing Denied Nov. 15, 1979.

Phillip B. Chew, William G. Conover, Conover, Claudon & Chew, Valparaiso, for defendants-appellants.

Theo. L. Sendak, Atty. Gen., Lesly A. Bowers, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Presiding Judge.

A jury found Roy Tolson and Emma Jean Maciejack guilty respectively of arson and arson with intent to defraud. They were sentenced to terms of not less than five (5) nor more than twenty (20) years. Their primary claim on appeal is that the verdicts were not sustained by sufficient evidence. We affirm.

■ Although the language employed by the courts is sometimes confusing in criminal cases where the conviction rests on circumstantial evidence, the guiding principal of appellate review is that we may not reweigh the evidence nor overturn an inference drawn by the jury if it was reasonable to draw that inference from the evidence. We will reverse the conviction only where we conclude that no reasonable jury could be convinced beyond a reasonable doubt of the accused's guilt. *See Ruetz v. State* (1978), Ind., 373 N.E.2d 152; *Manlove v. State* (1968), 250 Ind. 70, 232 N.E.2d 874; *Boyd v. State* (1977), Ind.App., 370 N.E.2d 939.

The arson statute, IC 35–16–1–1, provides:

"Any person who wilfully and maliciously sets fire to or burns, or causes the setting of fire to or the burning, or who aids, counsels or procures the setting of fire to or the burning of any dwelling house, rooming house, apartment house or hotel, finished or unfinished, occupied or unoccupied; or any kitchen, shop, barn, stable, garage or other outhouse, or other building that is part or parcel of any dwelling house, rooming house, apartment house or hotel, or belonging to or adjoining thereto, finished or unfinished, occupied or unoccupied, such being the property of another; or being insured against loss or damage by fire and such setting of fire to or burning, or such causing, aiding, counseling or procuring such setting of fire to or such burning being with intent to prejudice or defraud the insurer; or such setting of fire to or burning or such causing, aiding, counseling or procuring such setting of fire to or such burning being with intent to defeat, prejudice or fraud the present or prospective property rights of his or her spouse, or coowner, shall be guilty of arson in the first degree and, upon conviction thereof, shall be imprisoned in the state prison not less than five [5] years nor more than twenty [20] years, to which may be added a fine not to exceed two thousand dollars [$2,000]."

The state's case, especially that portion pointing to the guilt of the defendants, consisted of circumstantial evidence. It is therefore critical to look to the entire web spun by the evidence, rather than its separate threads, for it is upon the basis of the whole that the reasonableness of the inference must be judged.

■ Considering the evidence supporting the verdict, the record discloses the following:

Maciejack was the daughter of defendant Tolson. She was employed at the Welcome Inn which was owned and operated by Doris Tolson, daughter-in-law of defendant Tol-

son. For some time Maciejack had lived with George Childers. These two were contract purchasers of the dwelling house that burned. This house was insured against fire loss for $7000; its contents for $3000. Several months before the fire George Childers had moved to California, and shortly before the fire he had made it known that he had decided not to return to Indiana. Shortly before the fire the house was occupied by Maciejack and her two children. A cousin, Zernie Tolson, who was an alcoholic, lived in the basement. The fire occurred about 2:30 a. m. on March 17, 1974. Thereafter, Maciejack told others that all her belongings had burned in the fire; that she had lost everything. She made a fire insurance claim for the loss of her personal property. Subsequent investigation and evidence established that the fire had been set and an accelerant had been used.

The state's evidence established the following additional events. Maciejack's personal property had not been destroyed in the fire. Instead it had been systematically removed to other locations shortly before the fire. On the evening before the fire Maciejack sent her two children to Gary to visit their father. Also, that evening Doris Tolson caused Zernie Tolson to be arrested for drunkenness, and asked the police to hold him until morning and then let him go. After the fire two gasoline cans were found at the rear of the neighboring lot. These cans were identified as having been purchased by defendant Tolson on Friday, March 15th and filled with gasoline on Saturday, the sixteenth. When initially questioned, Tolson denied any knowledge of the cans. Finally, another employee of the Welcome Inn passed near the home thirty to forty-five minutes before the house was reported on fire. At that time she saw no indication of fire, but she did see Maciejack's car parked by the house.[1] Other evidence disclosed that Maciejack left the Welcome Inn at a time which would have provided opportunity to start the fire, and

that when the firemen arrived no other vehicle was there. When subsequently questioned under oath at a fire marshall's hearing, Maciejack stated that when she left the Welcome Inn she had gone to a truck stop with her girl friend. This, along with other testimony she gave at that hearing, was disclosed at trial to be false.

Considering all of the foregoing, we are unable to say that no reasonable jury could have inferred that these defendants were guilty beyond a reasonable doubt. The evidence was not insufficient.

■ Three other errors are asserted. The first concerns the court's refusal to suppress evidence obtained from the warrantless search of the burned out dwelling. The search was, however, conducted by the investigator for the insurance company, who was not a government agent. Accordingly, the illegal fruits doctrine is inapplicable. *Zupp v. State* (1972), 258 Ind. 625, 283 N.E.2d 540.

■ Secondly, it is claimed that IC 35–7–1–1, which permitted suspended sentences except in cases of murder, arson, etc., is unconstitutional in prohibiting a suspended sentence to one convicted of arson. The argument has no merit. The penalty set is within the constitutional prerogative of the legislature. There is no right to a suspended sentence. *See Farmer v. State* (1971), 257 Ind. 511, 275 N.E.2d 783. Accordingly, it is not impermissible for the legislature to preclude operation of the statute for certain offenses.

■ Finally, it is urged that the court unduly prejudiced the defendants through permitting extensive use of leading questions by the prosecutor. Many of such questions were not objected to. Others dealt with preliminary matters and were clearly permissible to expedite the proceedings. *In toto*, there is no showing sufficient to establish a clear abuse of discretion on the part of the court. *See Siblisk v. State* (1975), 263 Ind. 651, 336 N.E.2d 650.

The convictions are, therefore, affirmed.

1. At trial the witness testified the car "was like" the car driven by Maciejack and owned by Childers. A police officer testified that at the fire this witness told him she had seen the "owners" car there and a light on in the back of the house.

BUCHANAN, C. J. (sitting by designation) concurs.

STATON, J., dissents and files separate opinion.

STATON, Judge, dissenting.

I dissent from the majority opinion, since I do not agree that the search of Emma Maciejack's home after the fire was a private search covered by *Zupp v. State* (1972), 258 Ind. 625, 283 N.E.2d 540 as contended by the majority opinion. Rather, the warrantless search was illegal and in violation of Emma Maciejack's Fourth Amendment rights. *Michigan v. Tyler* (1978), 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 should have been applied by the majority to the concerted, warrantless search by David Kramer, an insurance company investigator, the North Judson Police Department, the North Judson Fire Department, and the State Fire Marshall's Office.

The fire at Emma Maciejack's home occurred on March 17, 1974. David Kramer, the insurance company investigator, arrived in North Judson, Indiana to conduct his investigation of the fire ten days later, March 27, 1974. He immediately visited the North Judson Fire Chief, Jerry Fingerhut, to gather information regarding the fire which occurred on March 17, 1974. Later, he went across the street to talk to police officer Combs of the North Judson Police Department. After his conversation with police officer Combs, he and his assistant, Mr. Ranker, left with police officer Combs for 501 North Main Street, the address of Emma Maciejack's fire-damaged home.

When they arrived at 501 North Main Street, police officer Combs assisted Kramer in his investigation by showing where he had found the gas cans after the fire. To further assist him and his investigation, Kramer had video tape equipment, a test kit, and a gas chromatograph. After his initial investigation, they left 501 North Main Street to visit and question Emma Maciejack. She was not at home, so they proceeded to interview next door neighbors and neighbors across the street. After these interviews, they returned to 501 North Main Street where they were joined by an off-duty fireman and another police officer. While on the premises of 501 North Main, the location of Emma Maciejack's fire-damaged home, Kramer testified that they "shot some outside photographs of the location where the gas can was, or alleged to be, then we took some outside shots of the building and went and had breakfast."

After breakfast, they returned to 501 North Main Street to continue their investigation of the burned home. Samples of burned wood and carpet were taken. Drawers were pried open and samples were taken for laboratory analysis. While the investigation continued, Emma Maciejack came by the house. She had a very general conversation with Kramer which included his identity as an insurance investigator. There is no testimony that she saw the other men on the premises or knew their identity. Kramer did not request her permission to search the premises. Later, she left her burnt home and returned for another conversation with Kramer. But, he did not attempt to obtain her permission for the search with the police and a member of the Judson Fire Department.[1] Kramer testified: "I had permission of the insurance company and I did not have Mrs. Maciejack's permission on March 28th."[2]

On March 28, 1974, Kramer had concluded that the fire was a result of arson.[3] He called the State Fire Marshall's Office and advised them of his conclusion. Later, Ralph Foster, a Chief in the Arson Division of the State Fire Marshall's Office, and Bill

---

1. At page 372 of the Transcript, David Kramer was asked: "At the time you talked to Mrs. Maciejack, was any official of the Fire Department of North Judson also present?" David Kramer replied, "Sir, there was someone there from the fire department, but I don't know what his capacity was." He was further asked:

"Did Mrs. Maciejack see him? Would she have known him?" and David Kramer replied, "I don't know that."

2. Transcript page 381, line 10.

3. Transcript page 394, line 9.

Goodwin also of the State Fire Marshall's Office, joined Kramer in another search of 501 North Main Street. This search took place on April 2, 1974, sixteen days after the fire. After several hours of searching the Maciejack home and discussing their joint investigations, Foster and Goodwin agreed with Kramer that the fire was of an incendiary nature. When Kramer was asked this question on the witness stand: "And neither you nor the State Fire Marshall's Office had permission to search on April 2nd or April 3rd, did you?" He answered: "No Sir".[4]

A few days later, April 10, 1974, the State Fire Marshall's Office conducted a hearing regarding the fire. Kramer interrogated witnesses at this hearing and presented the evidence of his investigation.

The search and seizure of evidence from Emma Maciejack's home at 501 North Main Street in North Judson, Indiana was not an investigatory intrusion by a private insurance investigator. It was an illegal, warrantless search in concert with the North Judson Police Department, the North Judson Fire Department, and the State Fire Marshall's Office. Without the evidence obtained from the search and the expert testimony of David Kramer, the convictions of Emma Maciejack and her father, Roy Tolson, can not stand. The judgments of the trial court should be reversed, and the trial court should be instructed to grant them a new trial.

The United States Supreme Court held in *Michigan v. Tyler, supra*, that a warrantless search of burned premises by government officials after the initial exigency attending the fire is invalid under the Fourth and Fourteenth Amendments and that the evidence obtained from such searches must be excluded. In *Michigan v. Tyler, supra*, a fire broke out shortly before midnight on January 21, 1970, at Tyler's Auction, a furniture store in Oakland County, Michigan.

The fire chief and a detective made several entries to search the premises of the furniture store after the fire had been extinguished on January 22, 1970. Later, on February 16, 1970, a Sergeant Hoffman of the Michigan State Arson Section returned to the furniture store to search the premises and to gather physical evidence. Sergeant Hoffman's search and seizure of evidence was excluded by the United States Supreme Court. The rationale used by the Court in *Camara v. Municipal Court* (1967), 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, was relied upon for the Fourth Amendment exclusion of the evidence. Fundamentally, this rationale hinges on safeguarding the individual's privacy and security from arbitrary invasions by government officials. *Camara v. Municipal Court*, 387 U.S. at 528, 87 S.Ct. 1727. Applying the *Camara* rationale, the United States Supreme Court concluded in an opinion written by Mr. Justice Stewart:

> "The entries occurring after January 22, however, were clearly detached from the initial exigency and warrantless entry. Since all of these searches were conducted without valid warrants and without consent, they were invalid under the Fourth and Fourteenth Amendments, and any evidence obtained as a result of those entries must, therefore, be excluded at the respondents' retrial."

*Michigan v. Tyler, supra*, 436 U.S. at 511, 98 S.Ct. at 1951.

David Kramer, an insurance investigator, in concert with police officer Combs, a member of the North Judson Fire Department, and members of the State Fire Marshall's Office conducted four illegal, warrantless searches of Emma Maciejack's burnt home without obtaining her consent.[5] The first of these illegal, warrantless searches occurred ten days after the fire and the last occurred seventeen days after the fire. No exigent circumstances attend-

---

4. Transcript page 381, lines 12 through 16.

5. David Kramer made four searches of the Emma Maciejack home. These searches were conducted on March 27, 28, and on April 2, 3. Transcript page 381, line 20. He testified that

he worked until dark on March 27. Transcript page 371, line 13. He spent a total of sixteen hours on the premises investigating the fire. Transcript page 406, line 13.

ed any of the searches. Much to the contrary, there was ample time to obtain a search warrant if a legal search had been desired by government officials. Emma Maciejack's constitutional right to privacy under the Fourth and Fourteenth Amendments has been violated. Any evidence obtained as a result of the four illegal, warrantless searches should have been excluded. When the trial court admitted the evidence from these four illegal searches, it committed reversible error.

I would reverse the judgment of the trial court with instructions to grant Emma Maciejack and her father, Roy Tolson, a new trial.