Emma Jean Childers MACIEJACK and
Roy Tolson, Appellants
(Defendants Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 580S137.

Supreme Court of Indiana.

May 16, 1980.

William G. Conover, Phillip B. Chew, Conover, Claudon & Chew, Valparaiso, for appellants.

Theodore L. Sendak, Atty. Gen. of Indiana, Lesly A. Bowers, Deputy Atty. Gen., Indianapolis, for appellee.

## ON PETITION TO TRANSFER

PRENTICE, Justice.

This cause is before us upon the petition to transfer filed by the defendants (appellants), following an adverse decision of the Court of Appeals, Third District. The opinion of that Court, authored by Judge Garrard, together with a dissenting opinion by Judge Staton, may be found at 393 N.E.2d 272 (Ind.App.).

Transfer is granted by reason of the failure of the Court of Appeals to give an opinion in writing upon a substantial issue presented by the defendants, which is identified here as Issue V. Accordingly, the decision and opinion of the Court of Appeals are hereby vacated, and the defendants' petition to transfer is hereby granted. We, nevertheless, affirm the judgment of the trial court.

Appellants were convicted in a trial by jury of arson and arson with intent to defraud. They were sentenced to imprisonment for terms of not less than five (5) nor more than twenty (20) years. This direct appeal presents five issues:

(1) Whether there was sufficient evidence to sustain the verdicts.

(2) Whether the defendants were denied a fair trial by the trial prosecutor's repetitive use of leading questions.

(3) Whether the trial court erred in overruling the defendants' motion for consideration of suspended sentences.

(4) Whether the trial court erred in admitting physical evidence and testimony resulting from searches by an insurance company investigator, all over the defendants' objections premised upon police involvement in the searches.

(5) Whether the trial court erred in admitting, over defendants' objections, testimony of an arson investigator from the office of the State Fire Marshall concerning his observations of the burned premises during a warrantless search by him made sixteen days following the fire.

\* \* \* \* \* \*

## ISSUES I, II & III

▆ Upon these issues, we adopt the opinion as written by Judge Garrard, as follows:

"Although the language employed by the courts is sometimes confusing in criminal cases where the conviction rests on circumstantial evidence, the guiding principal of appellate review is that we may not reweigh the evidence nor overturn an inference drawn by the jury if it was reasonable to draw that inference from the evidence. We will reverse the conviction only where we conclude that no reasonable jury could be convinced beyond a reasonable doubt of the accused's guilt. See Ruetz v. State (1978), Ind., 373 N.E.2d 152; Manlove v. State (1968), 250 Ind. 70, 232 N.E.2d 874; Boyd v. State (1977), Ind.App., 370 N.E.2d 939.

"The arson statute, IC 35–16–1–1 provides:

"'Any person who wilfully and maliciously sets fire to or burns, or causes the setting of fire to or the burning, or who aids, counsels or procures the setting of fire to or the burning of any dwelling house, rooming house, apartment house or hotel, finished or unfinished, occupied or unoccupied; or any kitchen, shop, barn, stable, garage or other outhouse, or other building that is part or parcel of any dwelling house, rooming house, apartment house or hotel, or belonging to or adjoining thereto, finished or unfin-

ished, occupied or unoccupied, such being the property of another; or being insured against loss or damage by fire and such setting of fire to or burning, or such causing, aiding, counseling or procuring such setting of fire to or such burning being with intent to prejudice or defraud the insurer; or such setting of fire to or burning or such causing, aiding, counseling or procuring such setting of fire to or such burning being with intent to defeat, prejudice or fraud the present or prospective property rights of his or her spouse, or coowner, shall be guilty of arson in the first degree and, upon conviction thereof, shall be imprisoned in the state prison not less than five [5] years nor more than twenty [20] years, to which may be added a fine not to exceed two thousand dollars [$2,000].'

"The state's case, especially that portion pointing to the guilt of the defendants, consisted of circumstantial evidence. It is therefore critical to look to the entire web spun by the evidence, rather than its separate threads, for it is upon the basis of the whole that the reasonableness of the inference must be judged.

"Considering the evidence supporting the verdict, the record discloses the following:

"Maciejack was the daughter of defendant Tolson. She was employed at the Welcome Inn which was owned and operated by Doris Tolson, daughter-in-law of defendant Tolson. For some time Maciejack had lived with George Childers. These two were contract purchasers of the dwelling house that burned. This house was insured against fire loss for $7000; its contents for $3000. Several months before the fire George Childers had moved to California, and shortly before the fire he had made it known that he had decided not to return to Indiana. Shortly before the fire the house was occupied by Maciejack and her two children. A cousin, Zernie Tolson, who was an alcoholic, lived in the basement. The fire occurred about 2:30 a. m. on March 17, 1974. Thereafter, Maciejack told others that all her belongings had burned in the fire; that she had lost everything. She made a fire insurance claim for the loss of her personal property. Subsequent investigation and evidence established that the fire had been set and an accelerant had been used.

"The state's evidence established the following additional events. Maciejack's personal property had not been destroyed in the fire. Instead it had been systematically removed to other locations shortly before the fire. On the evening before the fire Maciejack sent her two children to Gary to visit their father. Also, that evening Doris Tolson caused Zernie Tolson to be arrested for drunkenness, and asked the police to hold him until morning and then let him go. After the fire two gasoline cans were found at the rear of the neighboring lot. These cans were identified as having been purchased by defendant Tolson on Friday, March 15th and filled with gasoline on Saturday, the sixteenth. When initially questioned, Tolson denied any knowledge of the cans. Finally, another employee of the Welcome Inn passed near the home thirty to forty-five minutes before the house was reported on fire. At that time she saw no indication of fire, but she did see Maciejack's car parked by the house.[1] Other evidence disclosed that Maciejack left the Welcome Inn at a time which would have provided opportunity to start the fire, and that when the firemen arrived no other vehicle was there. When subsequently questioned under oath at a fire marshall's hearing, Maciejack stated that when she left the Welcome Inn she had gone to a truck stop with her girlfriend. This, along with other testimony she gave at the hearing, was disclosed at trial to be false.

"Considering all of the foregoing, we are unable to say that no reasonable jury could have inferred that these defendants were guilty beyond a reasonable doubt. The evidence was not insufficient.

\*　　\*　　\*　　\*　　\*　　\*

[1]. "At trial the witness testified the car 'was like' the car driven by Maciejack and owned by Childers. A police officer testified that at the fire this witness told him she had seen the 'owners' car there and a light on in the back of the house."

"* * * it is claimed that IC 35–7–1–1, which permitted suspended sentences except in cases of murder, arson, etc., is unconstitutional in prohibiting a suspended sentence to one convicted of arson. The argument has no merit. The penalty set is within the constitutional prerogative of the legislature. There is no right to a suspended sentence. See *Farmer v. State* (1971), 257 Ind. 511, 275 N.E.2d 783. Accordingly, it is not impermissible for the legislature to preclude operation of the statute for certain offenses.

" * * * it is urged that the court unduly prejudiced the defendants through permitting extensive use of leading questions by the prosecutor. Many of such questions were not objected to. Others dealt with preliminary matters and were clearly permissible to expedite the proceedings. *In toto*, there is no showing sufficient to establish a clear abuse of discretion on the part of the court. *See Siblisk v. State* (1975), 263 Ind. 651, 336 N.E.2d 650."

### ISSUE IV

The fire at Emma Maciejack's home occurred on March 17, 1974. David Kramer, the insurance company investigator, arrived in North Judson, Indiana to conduct his investigation of the fire ten days later, March 27, 1974. He immediately visited the North Judson Fire Chief, Jerry Fingerhut, to gather information regarding the fire which occurred on March 17, 1974. Later, he went across the street to talk to police officer Combs of the North Judson Police Department. After his conversation with police officer Combs, he and his assistant, Mr. Ranker, left with police officer Combs for 501 North Main Street, the address of Emma Maciejack's fire-damaged home.

When they arrived at the remains of the Maciejack house, at 501 North Main Street, police officer Combs assisted Kramer in his investigation by showing where he had found the gas cans after the fire, which as previously mentioned, was at the rear of a neighboring lot. To further assist him and his investigation, Kramer had video tape equipment, a test kit, and a gas chromatograph. After his initial investigation, they left 501 North Main Street to visit and question Emma Maciejack. She was not at home, so they proceeded to interview next door neighbors and neighbors across the street. After these interviews, they returned to 501 North Main Street where they were joined by an off-duty fireman and another police officer. Kramer testified that while they were on the premises of 501 North Main, the location of Emma Maciejack's fire-damaged home, they "shot some outside photographs of the location where the gas can was, or alleged to be, then we took some outside shots of the building and went and had breakfast."

After breakfast, they returned to 501 North Main Street to continue their investigation of the burned home. Samples of burned wood and carpet were taken. Drawers were pried open and samples were taken for laboratory analysis. While the investigation continued, Emma Maciejack came by the house. She had a very general conversation with Kramer which included his identity as an insurance investigator. There is no testimony that she saw the other men on the premises or knew their identity. Kramer did not request her permission to search the premises. Later, she left her burnt home and returned for another conversation with Kramer. But, he did not attempt to obtain her permission for the search with the police and a member of the Judson Fire Department. Kramer testified: "I had permission of the insurance company and I did not have Mrs. Maciejack's permission on March 28th."

■ The search was conducted by the investigator for the insurance company, who was not a government agent. Accordingly, the illegal fruits doctrine is inapplicable. *Zupp v. State* (1972), 258 Ind. 625, 283 N.E.2d 540.

■ We agree that a governmental investigatory agency cannot do, through a private investigator, what it could not do

itself.[2] The issue here is whether the evidence offered by the private investigator was the product or fruits of illegal police activity. The burden of showing such lay with the defendants. *Cf., Pirtle v. State,* (1975) 263 Ind. 16, 323 N.E.2d 634. Although representatives of the fire and police departments accompanied Kramer on his search of the premises there is nothing to indicate that it was their investigation— as opposed to his. It was Kramer who went to them not vice versa. Their investigation had been completed. It was logical for Kramer to begin his investigation with the public authorities that had previously investigated the fire. It is also logical that he would want the police to know who he was and why he was on the premises of another. There is a lack of persuasive evidence that would have required the trial court to find that Kramer was a de facto agent for the state in his search. Absent clear error, we will not set aside the trial court's determination in such matters.

## ISSUE V

On March 28, 1974, Kramer had concluded that the fire was a result of arson. He called the State Fire Marshall's Office, and advised them of his conclusion. Later, Ralph Foster, a Chief in the Arson Division of the State Fire Marshall's Office, and Bill Goodwin also of the State Fire Marshall's Office, joined Kramer in another search of 501 North Main Street. This search took place on April 2, 1974, sixteen days after the fire. After several hours of searching the Maciejack home and discussing their joint investigations, Foster and Godwin agreed with Kramer that the fire was of an incendiary nature. When Kramer was asked this question on the witness stand: "And neither you nor the State Fire Marshall's Office had permission to search on April 2nd or April 3rd, did you?" He answered: "No Sir."

■ This search of March 28th was a joint search and was unlawful at least as to the investigators from the State Fire Marshall's office. The conclusions formed by Foster in consequence thereof, were, therefore, inadmissible as direct evidence. It was not so offered, however. Rather, it was rebuttal testimony to impeach that of the defendant, Maciejack.

Testifying in her own behalf, Maciejack stated that she had packed some personal items and removed them in anticipation of moving to California, but that, due to an argument with her California boyfriend, she had had to postpone her moving plans. At one point she stated, "We lost everything." She also stated that the burned-out dwelling had been looted after the fire, but further inquiry into this point was prevented by the State's hearsay objection inasmuch as she had not personally viewed any of the alleged lootings. On cross-examination, the State introduced into evidence a list of articles which Maciejack had submitted to her insurance company. The list detailed the personal items allegedly lost in the fire, and included a color television set and an air conditioner. Immediately after her testimony, the State was allowed to call upon Foster to testify as a rebuttal witness. He stated that he had searched the remains of the Maciejack dwelling but had seen no signs of a television set or an air conditioner.

■ Evidence, though illegally obtained, may nevertheless be used for impeachment purposes. *Walder v. United States,* (1954) 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503; *Jacks v. State,* (1979) Ind., 394 N.E.2d 166; *Johnson v. State,* (1976) 258 Ind. 683, 284 N.E.2d 517. "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction to his untruths. Such an extension of the *Weeks v. U. S.,* 232 U.S. 383, 34 S.Ct. 341,

---

2. *See, generally, Stapleton v. Superior Court,* (1968) 70 Cal.2d 97, 73 Cal.Rptr. 575, 447 P.2d 967 and cases cited therein; 36 A.L.R.3d 553.

**12**

58 L.Ed. 652 doctrine would be a perversion of the Fourth Amendment." *Walder v. United States, supra*, at 65, 74 S.Ct. at 356, 98 L.Ed. at 507.

In the instant case, the State was properly allowed to impeach Maciejack's testimony that she had lost specific items in the fire with evidence that such items had not been so destroyed. That Maciejack had provided an alternative explanation—that looters had stolen the television and air conditioner before the arson investigators arrived upon the scene—went only to the weight of the impeaching testimony and not to its admissibility.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.