**Larry C. JONES, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 280S32.**

Supreme Court of Indiana.

Sept. 2, 1981.

Harriette Bailey Conn, Public Defender,
David P. Freund, Deputy Public Defender,
Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Frank A. Baldwin, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

On July 18, 1979, after a jury trial, Larry C. Jones was convicted of the offense of Aiding or Inducing Robbery Resulting in Serious Bodily Injury and of Aiding or Inducing Attempted Murder. He was sentenced to a determinate period of thirty-eight (38) years. A subsequent Motion to Correct Errors was overruled on November 8, 1979. This appeal followed.

Appellant raises several issues for our review concerning the allowing of testimony, the admission of exhibits, the denial of his Motion in Limine, the refusal and the giving of instructions, the sufficiency of the evidence, and the sentence imposed.

Around noon on December 20, 1978, Michele Bukowski, office manager for the Nehi-Royal Crown Corporation in South Bend, was counting the driver's deposits from the previous day when a man came to the door and requested a job application blank. He pushed his way into the office and said, "Give me the money." When Bukowski refused, the man shot her in the left side of her face. She fell, and when she got up, the money was gone. She summoned help by pushing a buzzer on her desk.

A plant supervisor, George Davis, heard engine noise and tires squealing and saw a green Nova "fishtail" past him. Simultaneously, he heard the buzzer alarm and another employee, Roger Hamilton, also saw the car. They went to the front office and on their arrival Hamilton saw Bukowski on her knees in the office. He broke a window in the office door. Michele Bukowski said she had been shot by a black male. Hamilton had seen two black males in the Nova. Davis called the ambulance while Hamilton tried to stop Bukowski's bleeding. Davis gave a description of the car to the police.

Officer Neizgodski received a broadcast concerning the robbery and stopped a car matching the description given. Officers Gassensmith, Klosowski and Neizgodski converged on the car and ordered the driver to stop. Officer Gassensmith had seen the passenger throw an object from the car which, when recovered, was found to be a .32 caliber revolver. Nine hundred fifty-six dollars ($956) were found in the passenger's coat pocket. The passenger was Armen Sylvester. Four .32 caliber bullets were found in the defendant, Larry Jones' pocket. Two of the bullets were identical in chemical composition to a bullet removed from the victim.

I.

Appellant alleges that the court erred in allowing State's witness Riley to testify concerning the results of neutron activation analysis tests he conducted on the bullets recovered from the appellant's coat pocket. F.B.I. Agent John P. Riley testified as an expert witness in regard to State's Exhibits 3–B, 3–C and 3–D as compared with State's Exhibit 6–A. This test compared the bullets taken from appellant Jones' pocket with a portion of the bullet removed from the victim. Appellant argues that the test is unreliable and that the prejudice to Jones outweighed the relevance of the testimony.

Agent Riley testified that he has conducted thousands of neutron activation analysis tests in the past twelve years and that he has testified as an expert witness on the subject approximately 150 times in both state and federal courts. He testified that neutron activation analysis is conducted by placing material in the core of a nuclear reactor. When radioactive, the material emits gamma rays which are analyzed to determine the amounts of trace elements present in the material. Riley testified that universities and government agencies throughout the world use the technique on a daily basis to perform elemental composition analysis and that it is a scientifically valid technique and is accepted worldwide. Riley was permitted to testify that it was his opinion that State's Exhibits 3–C, 3–D and 6–A either came from the same source of lead or different sources of lead having the same exact composition. While Exhibit

3–B was of the same general composition as the other bullets examined, Riley could not associate the bullet with the others because of minor compositional differences. Exhibit 3–A was a copper clad bullet unlike the lead bullet which was exhibit 6–A. Agent Riley stated that the bullet from the victim could have come from the same box of ammunition as did the two cartridges that had bullets that matched. Appellant complains that this testimony prejudiced him because the impact went greatly beyond the fact that these bullets were of the same caliber as the weapon and that three of them were made by the same manufacturer.

No Indiana case authority concerning the admissibility of neutron activation analysis has been found. However, there are cases from other jurisdictions admitting such evidence. *See: U. S. v. Stifel*, (6th Cir., 1970) 433 F.2d 431, *cert. denied* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531; *State v. Jackson*, (1978) Mo.App., 566 S.W.2d 227; *State v. Duncan*, (1976) Mo. App., 540 S.W.2d 130. The neutron activation analysis has been generally recognized as reliable. As was noted with regard to trace metal detection technique, the persuasiveness of evidence produced by such a test is, in large measure, dependent upon the expertise of the witness who conducted it, which in the final analysis is to be determined by the jury, only after an opportunity of careful cross examination. *Reid v. State*, (1978) 267 Ind. 555, 372 N.E.2d 1149, 1152. There was no error in allowing this testimony.

Appellant further argues that the evidence presented was without sufficient relevance and is without merit. Clearly the results of the test increased the likelihood that the bullets found in the defendant's pocket were from the same box as the bullet removed from the victim. The law in Indiana with respect to relevancy is that evidence is relevant if it has a tendency to prove a material fact. *Lock v. State*, (1980) Ind., 403 N.E.2d 1360, 1367. There is no error on this issue.

## II.

Appellant next claims that the trial court erred in permitting Witness Riley to testify concerning the ammunition industry. State's witness Riley testified that bullets which came from the same box of ammunition tend to have the same trace composition. The appellant objected and the objection was sustained. The State then questioned Riley concerning his knowledge of the ammunition industry and the defendant objected and asked that a hearing on Riley's qualifications be held outside the jury's presence. This objection was overruled. The witness then testified that he visited various ammunition manufacturers and went through hundreds of boxes of ammunition and analyzed them to determine if bullets from the same box had the same composition. He was then asked for his conclusion regarding the testing of the State's exhibits. Appellant failed to renew his objection. An objection to alleged improper testimony must be made at that critical point in the trial when the evidence is offered or when the question is asked. *Pavone v. State*, (1980) Ind., 402 N.E.2d 976, 979. Any objection to the witness' conclusions for want of a proper foundation has been waived.

## III.

Appellant next claims that the admission of State's Exhibits 3, 3–B, 3–C, 3–D, 6 and 6–A were not supported by a sufficient chain of custody. Appellant objects to the fact that the exhibits were out of the custody of the South Bend police for some months and that certain alterations had occurred on the exhibits in their absence. There was evidence that the bullets had been sent to the F.B.I. for testing. Officer Neizgodski testified that he removed four bullets from the defendant's coat pocket at the time of his arrest. He had placed his initial "N" on the tip of each bullet, placed the bullets in an envelope, and initialed and dated the envelope. He gave the envelope to Lieutenant Mahank, who testified that he received State's Exhibit 3 on December 20, 1978, and was told that it contained four

bullets. At trial Neizgodski was able to identify the State's Exhibit 3, the envelope, and 3–A by his initial on the tip of the bullet. He was unable to identify the remaining bullets, State's Exhibits 3–B, 3–C and 3–D because the tips had been removed. Mahank had checked the contents of State's Exhibit 3 in preparation for taking the evidence to Washington, D. C., to be tested. The exhibits were locked in his squad car overnight and were taken to Washington, D. C., the next day. Mahank gave the evidence to Agent John Riley. Riley clipped the tips from State's Exhibits 3–B, 3–C, 3–D, and 6–A, and tested the material. He identified these exhibits by his initials on the cartridges. Following testing the exhibits were returned to Mahank. He returned them to South Bend and locked them in his car over the weekend before returning them to the property room.

Dr. Jureziz had removed a portion of a bullet from the victim and placed an "X" on it and handed it to a police officer in the operating room. Jureziz stated that State's Exhibit 6–A had an "X" on it similar to the "X" he placed on the bullet removed from the victim. He testified that the bullet looked different from the slug from the victim because a portion of it had been carved away. Officer Brassell was present in the operating room and saw the doctor remove the bullet from the victim. He identified State's Exhibit 6 as the vial which contained the bullet.

█ The above evidence was sufficient to establish a proper chain of custody of these exhibits. The State must present only evidence which strongly suggests the whereabouts of the evidence at all times. *Holt v. State*, (1980) Ind., 400 N.E.2d 130. The mere possibility that evidence may have been tampered with will not make the evidence totally objectionable. *Kolb v. State*, (1972) 258 Ind. 469, 282 N.E.2d 541, 546. The admission of these exhibits was supported by a proper foundation.

### IV.

█ The appellant next claims that the court erred in denying his motion in limine concerning his prior convictions. Defense counsel made an oral motion in limine addressed to these convictions. The motion was overruled. On cross examination the State impeached Jones by bringing out the fact that he had been convicted of Theft in 1972, Theft in 1973, and Theft in 1975. Appellant acknowledges that his argument has been waived by the failure of his trial counsel to object at the time the evidence was actually presented to the jury. *Stubblefield v. State*, (1979) Ind., 386 N.E.2d 665; *Lagenour v. State*, (1978) 268 Ind. 441, 376 N.E.2d 475; *Pointon v. State*, (1977) Ind., 372 N.E.2d 1159. This issue has been waived.

### V.

█ The appellant claims the trial court erred in refusing to give the following instruction:

"Since you as jurors are judges of the law as well as the facts, you must give the Defendant the benefit of any reasonable doubts concerning the meaning of the law."

The substance of this instruction was adequately covered in the instructions given by the court. Defendant's Instruction No. 4, which was given, reads in pertinent part as follows:

"Article I Section 19 of the Indiana Constitution provides: 'In all criminal cases whatever, the jury shall have the right to determine the law and the facts.' At the same time, it is my duty to instruct you concerning the law. This means that you should pay respectful attention to the law contained in these instructions, should give the law a fair and honest interpretation, and should not ignore or disregard the law without a substantial reason. However, in reaching your final decision, you have the right to determine both the law and the facts by which your verdict will be governed...."

The court also instructed the jury on the presumption of innocence and on reasonable doubt. The jury was instructed that they must find the defendant not guilty if they

had reasonable doubt concerning his guilt. The jury was adequately instructed and the trial court did not err in refusing to give this instruction. *Jackson v. State*, (1980) Ind. 402 N.E.2d 947. *Vacendak v. State*, (1976) 264 Ind. 101, 340 N.E.2d 352; *Hash v. State*, (1972) 258 Ind. 692, 284 N.E.2d 770.

### VI.

■ Appellant next claims that the trial court erred in giving the following instruction:

"You will see that these instructions do not contain any information concerning the penalties that could be imposed upon a conviction. In this case, I am solely responsible for assessing the penalty within a broad range of possibilities. The law has been so written that you may make your decisions without being influenced by the apparent severity or leniency of the sentence."

Appellant argues that Article I, Section 19 of the Indiana Constitution requires that the jury know the penalties the defendant is facing for committing any act. Article I, Section 19 reads as follows:

"In all criminal cases whatever, the jury shall have the right to determine the law and the facts."

Appellant requests this court to reconsider its holding in *Inman v. State*, (1979) Ind., 393 N.E.2d 767 which held that it was not error for the court to refuse to instruct the jury as to possible penalties to be assessed when sentencing or the imposition of penalty was solely up to the judge. This court has consistently held that where the penalty is to be fixed by the court, failure to advise the jury of possible penalties does not constitute an invasion of the province of the jury to determine the law and facts. *Comstock v. State*, (1980) Ind., 406 N.E.2d 1164; *Craig v. State*, (1979) Ind., 398 N.E.2d 658. We decline to reconsider our position on this issue and reaffirm our holding that it is not error to instruct the jury that in the event of a guilty verdict, the fixing of punishment is a judicial function and not of concern to the jury. *Garcia v. State*, (1979) Ind., 394 N.E.2d 106. There was no error in the giving of the above instruction.

### VII.

■ Appellant also claims that the court erred in giving State's Instruction No. 10. That instruction reads as follows:

"You are instructed that flight of a person immediately after commission of a crime with which he is charged is a circumstance which may be considered, in connection with all other evidence to aid, in determining the defendant's guilt or innocence. Flight and similar conduct may indicate a consciousness of guilt in connection with all the other evidence in the case."

Appellant objected to the giving of this instruction at trial on the ground that it called to the attention of the jurors one specific bit of evidence. Here, on appeal, he argues that the instruction should have included the words "if there was such a flight," as have other instructions given on flight which this court has approved. *See: Frasier v. State*, (1974) 262 Ind. 59, 312 N.E.2d 77. Therefore, appellant is really arguing that this instruction is an incomplete statement of the law. Appellant did not tender a more complete statement of the law and objected on a different ground at trial. Therefore, any error has been waived. In addition, there was ample evidence of flight of the accused for the jury to consider it as evidence showing consciousness of guilt, and the court properly gave the instruction. *Roseberry v. State*, (1980) Ind., 402 N.E.2d 1248, 1251; *Porter v. State*, (1979) Ind., 391 N.E.2d 801, 812.

### VIII.

■ After the jury had been fully instructed and had retired to deliberate, they sent the following question to the court:

"*After* (*after* is the key word in this question) a crime is committed, if a person knowingly aids the perpetrator in his escape or avoidance of the law—is he guilty of the same crime?"

After lengthy discussion between counsel and the court, the court decided to answer the jury's question with a simple answer of

"No." Defendant proposed that the jury be instructed as follows:

> "There was in full force and effect on the 20th of December, 1978, a statute defining assisting a criminal, which is set out as follows—insert the language of the statute here. I don't know what the exact citation is—the defendant in this case was not charged with the violation of that statute."

Appellant was not charged with assisting a criminal and a trial court is not required to instruct the jury on uncharged crimes. In addition, appellant agrees that the answer, "No" is a correct answer to the jury's question. Appellant did not object to the court's answering the question. There is no error on this issue.

## IX.

◼ Appellant has failed to include an argument in the argument section of his brief concerning the issue of sufficiency of the evidence. This issue is therefore waived. A.P. Rule 8.3(A)(7); *May v. State*, (1976) 265 Ind. 25, 349 N.E.2d 171.

## X.

◼ Appellant also asks this Court to review his sentence contending that no reasonable person could find the sentence imposed appropriate under the circumstances presented here. Jones was sentenced to an aggravated term of thirty-eight (38) years. The sentence imposed for a Class A felony is presumptively thirty (30) years. The court considered the risk that Mr. Jones would commit another crime, the nature and circumstances of the crime committed, and the prior criminal record and character of Jones. The court examined the statutory list of mitigating factors and found none to be present. The court examined the list of aggravating factors and found that Mr. Jones has a history of criminal activity of three felony convictions prior to those in this case and of three misdemeanor convictions. The court noted the seriousness of the injury to the victim, and the risk that Jones would commit another crime. The court found that the aggravating circum-

stances outweighed the mitigating circumstances. There is no showing that the aggravated sentence given is manifestly unreasonable. There is no error on this issue.

Judgment affirmed.

GIVAN, C. J., and DeBRULER, and PRENTICE, JJ., concur.

HUNTER, J., dissents with separate opinion.

HUNTER, Justice, dissenting.

I must respectfully dissent to the opinion of the majority of this Court. The results of the neutron activation analysis lacked the reasonable scientific certainty which is requisite to the admission of expert scientific testimony. It may be that neutron activation analysis is or will become a commonly accepted and consistently reliable scientific procedure. The state has not produced sufficient evidence here, however, to justify the evidentiary use of its methods and results in the instant case.

That is not to say that FBI Agent Riley was not a properly qualified expert witness on the subject. His qualifications were amply demonstrated, including his role in the initial neutron activation research, his lectures at George Washington University, his work at the Oakridge Associates and the National Bureau of Standards, and his thirteen years in the laboratories of the Federal Bureau of Investigation. His status as an expert does not legitimize the methods and results of neutron activation analysis, however. The scientific community of course abounds with experts whose particular theses await the future acceptance or rejection of peers.

So it is that an expert's testimony that a certain conclusion is possible is without probative value. *Palace Bar, Inc. v. Fearnot*, (1978) 269 Ind. 406, 381 N.E.2d 858. There, Pivarnik, J., stated for this Court:

> "A doctor's testimony can only be considered evidence when he states that the conclusion he gives is based on reasonable medical certainty that a fact is true or untrue. A doctor's testimony that a certain thing is *possible* is no evidence at all.

His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a 'possible' cause of death." 269 Ind. at 415, 381 N.E.2d at 864 [emphasis in original].

Here, following his lengthy explanation of the manner and means by which his assessment had been made, Agent Riley was able to state only that the bullet taken from the victim "could have come" from the same box of ammunition as two of the three lead bullets seized from defendant. It contravenes *Palace Bar, Inc. v. Fearnot, supra,* to hold that the very tentative results of Agent Riley's neutron activation analysis are admissible; his conclusion simply lacks the reasonable scientific certainty to imbue it with probative value. *Id.*

Furthermore, defendant has cited authority wherein the results of neutron activation analysis have been rejected. He states in his brief:

"In the case of *State v. Holt,* (1969) 17 Ohio St.[2d] 81, 246 N.E.2d 365, the State secured a conviction based in large part on evidence that hair samples analyzed by neutron activation analysis matched. The Ohio Court reversed the conviction stating that the evidence concerning the neutron activation analysis and its supposed results should not have been admitted over the defendant's objection."

In *State v. Holt,* (1969) 17 Ohio St.2d 81, 246 N.E.2d 365, the Ohio Supreme Court reversed the defendant's conviction on the lack of certainty of the expert's ultimate conclusion. The Court explained:

"The following question was asked the witness by the state:

" 'Based on the Neutron Activation Analysis * * * do you have an opinion *based on reasonable scientific certainty* as to the similarity or dissimilarity of these specimens?' (Emphasis supplied.)

"His response was:

" 'The samples * * * are similar *and are likely* to be from the same source.' (Emphasis supplied.)

"The term 'likely' is a weaker one than 'reasonably certain' or 'probability' and carries appreciably less weight. Thus, in the case of *Ottgen v. Garey,* 41 Ohio App. 499, 505, 181 N.E. 485, 487, Lloyd, J., correctly stated:

" 'The word "likelihood" imports something less than reasonable certainty.'

\* \* \* \* \* \*

"Because of the witness's educational background and his apparent prestige, his testimony undoubtedly made an impression on the jury and was accorded greater weight than it was entitled to. Defendant was charged with a heinous and dastardly crime, and the jury apparently had difficulty in reaching a guilty verdict. "Our conclusion is that the testimony of the witness, respecting the comparative hair analysis, the procedures used in such analysis and his ultimate conclusion based thereon, did not reach that degree of certainty which the law demands, and his testimony should have been rejected; the failure to do so constituted error prejudicial to defendant." 17 Ohio St.2d at 85–86, 246 N.E.2d at 367–68 [emphasis in original].

Here, the statement that the bullets "could have come" from the same box of ammunition does not even approach the "likelihood" at issue in *State v. Holt, supra.* The lack of certainty in Agent Riley's ultimate conclusion is further emphasized by his testimony that as many as 100,000 bullets are produced from the same batch of lead, that 200 boxes of bullets of similar composition would in turn result, and that all retailers in a particular geographic area might consequently market bullets of similar composition. Furthermore, Agent Riley stated that "there are other leads that are going to be manufactured some place along the way that can be very close to this composition, if not the same." In stating that the bullets "could have come" from the same source, he offered little more than an educated guess which, under *Palace Bar, Inc. v. Fearnot, supra,* had no probative value. Consequently, it was error for the trial court to admit the expert testimony over defendant's *con-*

**136**

*tinuing objection*, duly acknowledged by the trial court, that the methods and results lacked the requisite scientific reliability and acceptance. *Id. See also, Zupp v. State*, (1972) 258 Ind. 625, 283 N.E.2d 540.

It is noted that a compelling case for the general admissibility of neutron activation analysis testimony was made in *United States v. Stifel*, (6th Cir. 1970) 433 F.2d 431. It is the particular circumstances of this case, which culminated in the very tentative conclusion of Agent Riley which renders the expert testimony inappropriate here. Those peculiar factors are not wholly unlike those considerations which prompt our refusal to admit the results of polygraph examinations. *Zupp v. State, supra.* Consequently, it is not implied that the general admissibility of expert testimony regarding neutron activation analysis is proscribed.

Here, however, the testimony should not have been admitted. And, for much the same reasons that prompted the reversal of judgments in *Palace Bar, Inc. v. Fearnot, supra,* and *State v. Holt, supra,* the trial court's error cannot be regarded as necessarily harmless.

The evidence regarding defendant's complicity in the robbery was wholly circumstantial in nature. Defendant, in a signed statement introduced into evidence, indicated that he drove Armen Sylvester to the Nehi-Royal Crown building without knowledge of his passenger's intent to commit robbery. He contended that he left the scene unaware that a robbery had occurred. He attributed the fact that his tires squealed as he drove away to the fact that the car was unfamiliar to him and the presence of snow, a condition which was corroborated by other evidence. Witnesses at the scene estimated the top speed of the auto as it was driven away was thirty-five miles an hour. Policemen who viewed the auto a short time later estimated it was traveling at approximately thirty miles per hour and indicated that it was not being driven in an erratic fashion. The stolen currency was found in Sylvester's possession. The only other evidence regarding defendant's participation in the robbery was the four bullets found in his pocket. Jones stated that the jacket belonged to his brother and that he had no idea that the bullets were present.

In determining whether the erroneous admission of evidence warrants reversal, the question is not whether there is sufficient evidence to support the conviction absent the improper evidence. Rather, the focal point of our inquiry is whether the evidence was likely to have had a prejudicial impact on the jury's conclusion that, *beyond a reasonable doubt,* the defendant was guilty. *Sulie v. State*, (1978) 269 Ind. 204, 379 N.E.2d 455; *Mitchell v. State*, (1972) 259 Ind. 418, 287 N.E.2d 860; *Otto v. State*, (1980) Ind.App., 398 N.E.2d 716.

Here, the erroneous admission of the neutron activation analysis results was not cumulative evidence. Nor are we confronted with other evidence which points so unerringly and overwhelmingly toward defendant's guilt that the impact of the erroneously admitted evidence was necessarily minimal. *See Whitten v. State*, (1975) 263 Ind. 407, 333 N.E.2d 86. Rather, as in *White v. State*, (1971) 257 Ind. 64, 272 N.E.2d 312, where this Court found such prejudicial impact, the evidence is wholly conflicting in nature. And while in *White v. State, supra*, there were three eyewitness identifications of defendant as the perpetrator, we have only the circumstantial evidence of the state vis-a-vis the credibility of the defendant to measure here. Inasmuch as the jury's decision rested on circumstantial and conflicting evidence, and in turn on an evaluation of the credibility of witnesses, we cannot conclude that the erroneous admission of the expert testimony had no prejudicial effect on the jury's conclusion that defendant was guilty beyond a reasonable doubt. *Compare, Mitchell v. State, supra; White v. State, supra; Otto v. State, supra; Morris v. State*, (1979) Ind.App., 397 N.E.2d 1056; *Johnson v. State*, (1979) Ind. App., 384 N.E.2d 1035. It cannot be doubted that, as the Supreme Court of Ohio reasoned in *State v. Holt, supra,* extensive and impressive credentials such as those revealed here, together with testimony of a

sophisticated technological nature far beyond the average layman's understanding, may impress a jury and influence inordinately the weight which is attached to the expert's testimony.

The erroneous admission of Agent Riley's testimony constitutes reversible error. The judgment of the trial court should be reversed and the cause remanded for a new trial. I dissent.